MANHATTAN LIFE INS. CO. (RINKER v.). See Case No. 11,851.

MANHATTAN LIFE INS. CO. (SCHUMACHER v.). See Case No. 12,490.

## Case No. 9,026.

### MANHATTAN MEDICINE CO. v. WOOD et al.

[4 Cliff. 461; 14 O. G. 519; Cox, Manual Trade-Mark Cas. 359.] [1]

Circuit Court, D. Maine. Sept. 21, 1878. [2]

TRADE-MARKS—ENTIRETY — SPURIOUS ARTICLE— LACHES — TERRITORIAL LIMITS — RELINQUISHMENT — RESEMBLANCE — FUTURE INFRINGEMENT.

1. Trade-marks are an entirety, and are incapable of exclusive use at different places by more than one independent proprietor; for, in seeking redress, in order to establish an exclusive right to the mark, the party must show an exclusive right to the commodity to which it is attached.

2. Rights to a trade-mark may be forfeited if the mark is deceptively used to designate a spurious article, and a party thus affected can convey no valid title in the mark to another.

3. Equity will not decree for an account of past gains and profits where there has been laches in bringing suit and long acquiescence in the adverse use of the mark by others.

4. Disregard of territorial limits allotted by license of proprietor and misuse of the trademark, are a forfeiture of right, and a defeat to any valid conveyance by the wrong-doers.

5. Voluntary relinquishment of the original mark of the proprietor for another, devised by the grantees themselves, is a forfeiture of right to the old mark no less than its misuse to designate a spurious article.

6. Equity gives relief for the infringement of a trade-mark, upon the ground that one man is not allowed to offer his goods for sale, representing the goods to be the manufacture of another in the same commodity.

7. Two trade-marks are substantially the same, in legal contemplation, if the resemblance is such as to deceive ordinary purchasers, giving such attention to the same as purchasers usually give, and to cause them to purchase the one manufacture supposing it to be the other.

8. Cases arise where the title is complete, when a party, though not entitled to a decree for an account, may still be entitled to a decree to prevent future infringements. But if the defendant has the genuine article, and manufactures it, and it is not protected by a patent, and the complainant has no exclusive right to the trade-mark, then the complainant can have no relief.

9. If several alleged owners of a trade-mark, whose rights are determined by territorial limits, for years disregard each other's rights, and mutually violate each other's territorial privileges, and make no efforts to uphold the same, they cannot set up as valid what they themselves have destroyed, nor assign any exclusive valid claim therein to others.

This was a bill in equity [by the Manhattan Medicine Company] praying for an account and an injunction against the respondents [Nathan Wood and John S. Wood] for the violation of the complainants' right of property in alleged trade-mark on Atwood's Vegetable Physical Jaundice Bitters. It was claimed that the complainants derived

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission. Cox, Manual Trade-Mark Cas. 359, contains only a partial report.]

[2] [Affirmed in 108 U. S. 218, 2 Sup. Ct. 436.]

title through mesne assignments from one Atwood, who had adopted and used the designation on the article named, of which he was the inventor and at one time proprietor. There was no patent on the compound, and no registry or patent of the trade-mark.

Chase, Bestow & Holt, for complainants.

Brief of Philo Chase.

Some forty years ago, one Moses Atwood, then of Georgetown, Mass., first prepared and sold the plaintiffs' bitters under the name of "Atwood's Vegetable Physical Jaundice Bitters." About the year 1852, Atwood sold an interest in his said business to Carter & Dodge of said Georgetown, a firm composed of Moses Carter and Benjamin F. Dodge. Thereafter Atwood carried on said business in conjunction with said Carter & Dodge until 1855, when he sold out to them his remaining interest in the business, including his stock on hand, debts due, the right to use his name in the manufacture and sale of said medicines, all the labels, trade-marks, good-will, and all the other rights pertaining to said business, for which Dodge & Carter paid him some four or five thousand dollars. About this time, Charles L. Carter, a son of Moses Carter, was taken into the firm of Carter & Dodge, constituting the new firm of Carter, Dodge & Co. This new firm, having succeeded to all the rights of Carter & Dodge in said business, carried on the same for some three years, using Atwood's name, recipes, trade-marks, &c., as theretofore done by Atwood and Carter & Dodge. Then the firm of Carter, Dodge & Co. was dissolved by mutual consent and agreement that the several partners should thereafter own and use the Atwood recipes, trade-marks, &c., in common, each selling on certain prescribed territory. After the dissolution of the partnership of Carter, Dodge & Co., the business was carried on in accordance with the terms of the dissolution agreement as to the common use of the Atwood name, recipes, labels, trade-marks, &c., by the several parties in interest. Then the Carter branch of the business was carried on for about five years by Moses Carter and his son, Charles L., under the style of Carter & Son; then Charles sold out his interest, and his brothers, Luther F. and Moses F., took his place in the firm, it then becoming M. Carter & Sons. Then Moses Carter died, his interest going to his two sons and partners, Luther and Moses. Thereafter, Luther F. Carter carried on the business until the sale of the Carter interest to the plaintiffs. Dodge carried on his branch of the business for some time after the dissolution of Carter, Dodge & Co., and then sold his interest to Noyes & Manning and Will. B. Dorman; Noyes & Manning and Dorman then carried on the Dodge branch of the business until their conveyance thereof to the plaintiffs. Lewis H. Bateman, of Georgetown, also had or claimed to have an interest in Atwood's medicine business, by virtue of some partnership or other relation with Atwood. Carter, Dodge & Co. at first denied his claim, and attempted to stop him by a suit, but failed to prosecute it to a successful issue; and thereafter Bateman used the Moses Atwood name, label, and the fluted bottle in common with Carter, Dodge & Co. and their successors until his decease. Thus the plaintiffs acquired the entire ownership of the Atwood medicine business, together with all of its accompanying rights of trade-marks, good-will, &c. From abundant caution rather than from any necessity, the plaintiffs also took conveyances from all of the Carter heirs, and from Dodge, of all their respective right, title and interest in said business, trade-marks, &c. From the time Moses Atwood first put up and sold said bitters, about forty years ago, he and all of his successors have always used the same name and label for their said bitters.

Moses Atwood having first adopted and used the name, label, &c., in question, to distinguish his article of bitters, acquired the exclusive right to the same. Amoskeag Manuf'g Co. v. Spear, 2 Sandf. 599, Cox, Trade-Mark Cas. 87; Davis v. Kendall, 2 R. I. 566; Williams v. Johnson, 2 Bosw. 1; Boardman v. Meriden Britannia Co., 35 Conn. 402; Chappell v. Sheard, 2 Kay & J. 117; Upton, Trade-Marks, 47; Curtis v. Bryan, 36 How. Prac. 33; Filley v. Fassett, 44 Mo. 168. "Every person who uses a trade-mark, be it the label on a bottle, or the name or title of a periodical or magazine, by his appropriation and use of the name, acquires a property in that name, and has a right to restrain any other person from using the same name in such a manner as would lead, or be calculated to lead the public to believe that they are purchasing one thing when in truth they are purchasing another." Bradbury v. Beeton, 39 Law J. Ch. (N. S.) 57.

The name "Atwood's Vegetable Physical Jaundice Bitters" was first devised, adopted, and used by Moses Atwood to designate and distinguish his bitters; it was used by him for that purpose for about fifteen years, until he sold out his business to Carter, Dodge & Co. in 1855; it served to distinguish his bitters from all other bitters. Generally, the use of the two words "Atwood's Bitters" is sufficient to distinguish them, and the words "Atwood's Jaundice Bitters" are always sufficient. The name and label of the article were its distinguishing marks; the marks by which it became known to the public; the marks by which it was bought and sold; the marks by which it achieved its high reputation. These, as marks for this make of bitters, were exceedingly valu-

able. Moses Atwood had made the marks valuable by his skill, industry, and enterprise in making and selling an article the public was glad to purchase. These marks constituted the principal value of the article, because, it being known to the public by these marks, it could not be sold without them. As such marks in connection with such use, they constituted valuable property: this property belonged to Moses Atwood; he had created it. The marks, when he first adopted them, had no more value than various other marks he might have chosen instead; but by their long use to designate and distinguish his article they had become endowed with value. The plainest justice demands that a person having so created such value should be protected in the enjoyment of it, and reap the reward of his merit. The highest public policy also demands such protection, because the hope of such reward is the encouragement of labor, integrity, and excellence. By such protection, the maker and seller is stimulated to make and sell an article which by its goodness shall commend itself to public favor; and the public are correspondently benefited by knowing where to purchase a good article.

The courts of every civilized state in the world have long recognized trade-marks as property, and given them the fullest protection as such. Amoskeag Manuf'g Co. v. Spear, supra.

Atwood's trade-marks, &c., in connection with the business of making or selling the article to which they belonged, were transferable. Eden, Inj. (1st Am. Ed.) 226; Edelsten v. Vick, 11 Hare, 78; Walton v. Crowley [Case No. 17,133]; Joseph Dixon Crucible Co. v. Guggenheim, 2 Brewst. 321; Gillis v. Hall, Id. 342; Congress & Empire Spring Co. v. High Rock Congress Spring Co., 45 N. Y. 291; Filkins v. Blackman [Case No. 4,786]; Winsor v. Clyde, 9 Phila. 513; Upton, Trade-Marks, 52,—where the author says: "Property in trade-marks may be obtained from him who has made the primary acquisition."

Moses Atwood, by his transfer to Carter & Dodge, and Carter, Dodge & Co., vested this property in them. Carter, Dodge & Co., being the owners of the trade-marks, &c., could hold or own them jointly or in common. As long as the partnership lasted, they held them in joint ownership; but after the dissolution of the partnership they held them in common. There was nothing to prevent this. Each party had the recipe; one could make the article as well as the other. Whichever party made it, the public was supplied with the genuine article. The name and label indicated the genuine article, whether it was made by one of the Carters or by Dodge, just the same as they did when it was made by Carter, Dodge & Co. as a firm, or when made by Atwood himself. It is well settled

that trade-marks, like other property, may be owned in common by different parties. Dent v. Turpin, 7 Jur. (N. S.) 673; Cod. Trade-Marks, 269, and cases.

On the dissolution of a partnership, each partner is, in the absence of any special agreement, entitled to trade under the name, or style of the old firm. Banks v. Gibson, 34 Beav. 566. Luther E. Carter succeeded to all the rights of Moses Carter and Charles L. Carter. It will be remembered that the two latter were members of the firm of Carter, Dodge & Co.; that, upon the dissolution of Carter, Dodge & Co., the Carter branch of the business was carried on by the two Carters, under the name of Carter & Son; that Charles L. sold out his interest in Carter & Son to his brothers, Luther F. and Moses F., and the Carter firm became Carter & Sons, which continued up to the time of the eldest Carter's decease, in 1870; and that Luther F. and Moses F. succeeded to the business of Carter & Sons. They would so succeed as surviving partners; besides, Moses Atwood devised to them his interest in the business, and Luther F. Carter then purchased the interest of his partner, Moses F., and thus became the sole owner of the Carter interest.

Trade-marks being property, and transferable like other property, and ownable jointly or in common, a legal title to an interest in the business, trade-marks, labels, &c., passed to Luther F. Carter. Cases supra.

Trade-marks pass by operation of law. Hine v. Lart, 10 Jur. 106. The Dodge interest in the business, trade-marks, &c., were legally transferable to Dorman and Noyes & Manning, according to the principles before stated. The interest of Dorman, and Noyes & Manning, and Carter, and Bateman were likewise transferable to the plaintiffs.

The rule is that the court will enjoin any imitation calculated to deceive ordinary purchasers. Cases supra; Crawshay v. Thompson, 4 Man. & G. 385; Davis v. Kendall, 2 R. I. 566; Holmes v. Holmes, Booth & Atwood Manuf'g Co., 37 Conn. 278; Wotherspoon v. Currie, 22 Law T. (N. S.) 260; Hookham v. Pottage, 26 Law T. (N. S.) 755. To be enjoinable, it is not necessary that the imitation should be complete; the imitation may be limited and partial, and still enjoinable. Lockwood v. Bostwick, 2 Daly, 521; Franks v. Weaver, 10 Beav. 297; Coffeen v. Brunton [Case No. 2,946]; Amoskeag Manuf'g Co. v. Spear, supra; Shrimpton v. Laight, 18 Beav. 164; Walton v. Crowley, supra; Clark v. Clark, 25 Barb. 76; Brooklyn White Lead Co. v. Masury, Id. 416; Hostetter v. Vowinkle [Case No. 6,714]. To be enjoinable, it is not requisite that the imitation should be intentionally deceptive. Millington v. Fox, 3 Mylne & C. 338; Dale v. Smithson, 12 Abb. Prac. 237.

It is no defence that the imitator informs purchasers of the imitation. It is no answer for the defendants to say that they sold the

bitters as theirs. Coats v. Holbrook, 2 Sandf. Ch. 586; Chappell v. Davidson, 2 Kay & J. 123. It is sufficient, to establish a case for relief, to show that the imitation has led or is likely to lead to mistakes. Clement v. Maddick, 5 Jur. (N. S.) 592. It is proved, as before shown, by the leading druggists and medicine men of New York and Boston, that purchasers are likely to be deceived into purchasing the defendant's round-bottle style for plaintiffs'. The plaintiff, in trade-mark cases, is entitled to relief, though the respondent did not know that the mark used was a trademark. Kinahan v. Bolton, 15 Ir. Ch. 75; Harrison v. Taylor, 11 Jur. (N. S.) 408; Hall v. Barrows, 10 Jur. (N. S.) 55; Ainsworth v. Walmsley, 12 Jur. (N. S.) 205. But the defendants must have known that they were using trade-marks which belonged to the successors of Moses Atwood. The Moses .Atwood's Bitters was a well-known article in the medicine trade. It is well known by its name and labels, which constitute its trademarks—goodwill marks they might be called.

The defendants' position, that plaintiffs' trade-marks have become common property by common use, is not tenable. The fact that the trade-marks were used in common by the common owners thereof did not make them common property as to all the world. But if other parties had, in fact, infringed the plaintiffs' trade-marks, that is no excuse for the defendants' infringement. Taylor v. Carpenter [Case No. 13,784]; Coats v. Holbrook, supra. There never was any abandonment of plaintiffs' trade-marks. For more than forty years they have been constantly used by Moses Atwood and his successors, who have always openly and notoriously claimed to be the exclusive owners thereof. A party claiming property against the real owner, on the ground of the latter's abandonment thereof, must establish the fact of abandonment by the strongest proof. There is no proof in this case of any abandonment of the trade-marks by their owners. The proof is all to the contrary. The use of a trade-mark by different parties will not operate as an abandonment by the rightful owner. Sohl v. Geisendorf, Wils. (Ind.) 60.

There has been no such consent or acquiescence as to deprive the plaintiff of protection against continuing infringement. Neither Moses Atwood nor any of his successors ever consented to the defendants' use of their trade-marks, expressly or impliedly. There were no dealings between them, or other circumstances from which a consent could be implied. All the circumstances of the case negative all inference of any such consent. There is no evidence in the case that the owners of the trade-marks ever had the legal evidence to establish a case of infringement against the defendants. The defendants were out of the jurisdiction of the courts of the state in which the trade-mark owners resided. Were they obliged to go into a foreign jurisdiction to prosecute the defendants, in order to prevent an implied acquiescence in the use of their trade-marks by the defendants? Besides, if there had been any such consent or acquiescence, it was merely gratuitous, and revocable at the pleasure of the owners. Amoskeag Manuf'g Co. v. Spear, 2 Sandf. 599; McCardel v. Peck, 28 How. Prac. 120; Gillott v. Esterbrook, 47 Barb. 455.

Laches cannot be imputed to the owners. There is no case where relief has been refused on the ground of laches under circumstances like those in this case. Wherever relief has been refused on the ground of laches. the circumstances have been such as made it a case of great hardship for the party to be enjoined, as where the right to the trademarks has been in great doubt, or the dealings and relations between the parties have been such as to show consent of the one and good faith of the other, and probable loss to an innocent party. No statute of limitations bars the plaintiffs of protection of their trademarks. Taylor v. Carpenter [Case No. 13,784]. Such a defence is an abhorrent one, even in an action at law. Taylor v. Carpenter [Id. 13,785].

The plaintiffs seek protection against future wrong, as well as indemnity for past wrong. The defendants persist in selling their imitation, and threaten to continue such imitation in future unless they are restrained therefrom. There is no pretence that the defendants mean to desist from using their trademarks unless restrained. No question of statute of limitations can arise as to such protection in the future. As to the past, each infringement has been a separate trespass. Possibly, the plaintiffs may not have the right to recover damages for infringements committed more than six years before the commencement of the action.

It cannot be said that the defendants have acquired any prescriptive title. The unlawful use of a trade-mark for twenty years held no bar. Gillott v. Esterbrook, 48 N. Y. 374. Ten years held no bar in Wolfe v. Barnett, 24 La. Ann. 97. Nine years held no bar in Lazenby v. White, 41 Law J. Ch. (N. S.) 354. The fact that Luther F. Carter for a while made his bitters of less than the usual strength is no defence to the plaintiffs' relief against the defendants' imitation. These bitters were precisely the same as the full-strength bitters, except in the matter of strength; the medical ingredients were the same; the only difference was in the quantity of water; to produce as much and the same effect it was only necessary to increase the dose. But this is wholly an immaterial fact. The selling of an article inferior in some respects to its accustomed goodness does not destroy its trademarks. though it may affect their value by diminishing the reputation of the article. Besides, the plaintiffs are not selling, and have never sold, the weakened bitters. How then can its trade-mark rights be affected by the fact that Luther F. Carter sold an inferior article? Did that fact destroy the trade-

marks, not as to himself, not also as to his co-owners? There is no such rule of law as that.

A party is sometimes denied relief on the ground of his misrepresentation of his article, and consequent deception of the public. If Luther F. Carter was the plaintiff seeking protection for his article, and it appeared that it was a fraud, the court would not protect it, as the court will not protect fraud. But that is not the case. Plaintiffs are not asking the court to protect a fraudulent article. There is no pretence that the plaintiffs' article is a fraudulent one. There is no misrepresentation or deception by plaintiffs' labels in respect to the actual manufacture. The words, "manufactured by Moses Atwood, Georgetown, Mass.," &c., is a part of the old label as originally adopted. The label has never been changed. It is important that the labels of an article should not be changed, as a change produces doubt and confusion as to the genuineness. Medicine proprietors never change their labels when they can possibly avoid it. The name of the original maker is retained on the label or appears upon the article. Take, for instance, the article of "Day & Martin's Blacking," or "Rodgers & Sons' Cutlery," "Wade & Butcher's Razors," and many others. It is like retaining the business name of an old firm long after such firm has ceased to exist. People go to such a house, not because they expect to meet the old firm, but from habit and good will, and the old name indicates the old place. So of an article of medicine, or any other,—people buy it because they have been accustomed to and because they like it. They do not suppose that the original maker, whose name appears on it, is still the maker, but that his name is a mark of genuineness merely.

But in this case, if it were a matter of any importance, it has always been known to the public who were the actual makers of the article in question. When Carter, Dodge & Co. made it, they advertised and sold it as the makers; so of all the successors. The plaintiffs are accustomed to enclose each bottle of their bitters in a printed wrapper, showing that they are prepared and sold by the plaintiffs at the city of New York. There is no misrepresentation or concealment on the part of the plaintiffs. But this is a matter of no consequence. The bitters sold by the plaintiffs are compounded according to the same recipe as the bitters sold by Moses Atwood. Purchasers buy the plaintiffs' bitters because they suppose they are the same; they get just what they intend to buy, so there is no deception. But such a defense comes with poor grace from fraudulent imitators like the defendants.

Nathan Webb and W. H. Clifford, for respondents.

Brief of W. H. Clifford.

The complainants claim title through certain assignments, and allege, as to the origin of the property in the said trade-mark, as follows: "That your orator is informed and believes, and alleges that said medicine was first invented and put up for sale, about twenty-five years ago, by one Dr. Moses Atwood, formerly of Georgetown, Massachusetts, by whom, his assigns and successors, the same has been ever since made and sold, by the name, in the manner, and with the trade-marks, labels, and description, the same or substantially the same as aforesaid." The "assigns and successors" of Moses Atwood sold the right, whatever it was, to the complainants. What did the "assigns and successors" of Moses Atwood really take from him, and were in consequence able to grant these complainants? The "assigns and successors" are, in the first place and degree, L. H. Bateman and his heirs, Moses Carter and his heirs and successors and assigns.

On page 43 of the printed record is found the deed to the Manhattan Medicine Company from the heirs of L. H. Bateman. Now this deed claims no right at all as derived from Moses Atwood, and makes no mention of any such right. It seems, from the deed itself, to be a right which began and ended with the Bateman family. This piece of documentary evidence has no tendency to support any allegation of the bill, but flatly contradicts it. This contradicts the fundamental allegation of the bill; viz., the one showing the title of the complainants to the alleged property. If Moses Atwood had the exclusive right to this trade-mark at the outset, and never transferred a right to Bateman, then Bateman's right must have been derived from some other man, or else obtained by trespass upon, and in violation of, Moses Atwood's rights. The right of property in a trade-mark is an exclusive right. If such right is assumed by another, and the assumption acquiesced in, the exclusive right of the original owner is necessarily gone. If that be so, then no after-coming person can claim the exclusive right to the alleged trade-mark, both from the person who first had it, and the person who destroyed it, and used it by virtue of having destroyed the legal rights of the first owner.

The contract of September 29, 1852, states, "Said Carter and Dodge are to have the right to use said Atwood's name on the labels and circulars, and to manufacture and sell the following medicines, viz., Atwood's Vegetable Jaundice Bitters, Atwood's Compound Extract of Sarsaparilla, Atwood's Dysentery Drops, Atwood's Rheumatic and Spinal Elixir," &c. Extracts from the testimony will show that the proposition of the respondents is correct, viz., that no trade-mark at all was ever sold by Moses Atwood to anybody.

The complainants allege in their bill that Moses Atwood was the originator of a certain trade-mark that he assigned to certain others, and that they, the complainants, bought of those assignees of Atwood. All the evidence they have introduced on this

point is an effort to sustain that allegation. But the evidence fails to show that Atwood had any fixed and established trade-mark for his medicine. It fails to show that his successors put up the medicine in the same manner as he did, and it not only fails to show that the complainants have acquired whatever bottle, label, &c., that Atwood used, but shows clearly that they acquired something quite different, if they acquired anything. The deed from Atwood was simply of the right to use his name. What was this right thus to use his name? It could not be a license to publish the falsehood which they did,—"prepared by Moses Atwood, Georgetown, Mass.,"—for that would have been a contract wholly invalid. It meant simply that they should be called Atwood's medicines, as recited in the contract. The contract could not and did not contemplate that they should say that Moses Atwood prepared the bitters, when he did not. The contract merely said that those new manufacturers should advertise to the world that the medicines were Atwood medicines, prepared according to his recipes, which he sold to these men.

Upon this point the cases are clear. "Whenever the question arises whether any particular name or mark, can be appropriated as property, or rather whether one who adopts such name, &c., is entitled to the protection of the law in its exclusive use . . . the answer must depend upon the determination of the question, whether such name, &c., is used to designate and does in fact designate the article to which it is affixed as the production of the manufacturer who has adopted it, . . . to furnish to the public the assurance of origin and ownership of the article, &c." Upton, Trade-Marks, p. 98. "All who use trade-marks indicating that the articles were originally manufactured or owned by others are practising an imposition on the public. Every assignee and purchaser who has the trade-mark of the original proprietor, without indicating that he is the assignee or purchaser, is in this position." Sherwood v. Andrews, 5 Am. Law Reg. (N. S.) 588; Partridge v. Menck, 1 How. Cas. 547.

If any celebrity had attached to the particular medicine in question, it had so attached by reason of the name of Atwood. It could not be by reason of the word "bitters," for that is a common word. It could not be by virtue of the words "vegetable, physical, jaundice," for they are descriptive words and cannot form a trade-mark or part of the same. Amoskeag Manuf'g Co. v. Spear, 2 Sandf. 599; Stokes v. Landgraff, 17 Barb. 608; Bininger v. Wattles, 28 How. Prac. 206. Therefore the only title or trade-mark which could be attached to these bitters was the words "Atwood's Bitters," or "Moses Atwood's Bitters." Such a trade-mark the assignors of the plaintiffs could not lawfully use without adding thereto the state-

ment that they were the successors of Moses Atwood, Georgetown, Mass., and as such were making the bitters. Here the allegation of the bill is that they have prepared these bitters, and asserted on the labels that they were made by Moses Atwood. Not only this, but while representing them as made at Georgetown, Mass., where they were originally made, and where they acquired their reputation, they are now admitted to be put up in New York City.

Misrepresentation by the user of the trade-mark invalidates it. Leather Cloth Co. v. American Leather Cloth Co., 11 Jur. (N. S.) 513, Cox, Trade Mark Cas. 699; Palmer v. Harris, 60 Pa. St. 156. By all complainants' testimony it is admitted that nothing passed as a trade-mark but Atwood's name. For twenty years before the assignment, in 1875, to the Manhattan Medicine Co., the assignors of the complainants had been making and selling this article, and all representing that the bitters were prepared by Moses Atwood, Georgetown, Mass., when it is in evidence that Atwood sold out to Carter & Dodge in 1855, and went to the state of Iowa, where he has ever since lived. Now all the sales of these bitters made since 1852 have been made to the public upon the false representation that they were "manufactured by Moses Atwood," with some exceptions to be named hereafter in connection with another point. I apply to this, and the continued sales of the bitters by the present complainants, the rule that "assignees of trade-marks have no special privileges of sailing under false colors, and if they will persist in so doing, prudence would dictate that they give courts of equity a wide berth." Sherwood v. Andrews, before cited. Thus Moses Atwood could not assign to the assignors of the complainants what they claim to have owned, nor could said "successors and assigns" assign the same to the present complainants.

A trade-mark upon an article of manufacture is to, and must, denote the origin and manufacture of the article. It is upon this that the public relies when purchasing. The reputation of the manufacture is what gives assurance of the quality of the goods. Therefore no purchaser of the secret of that manufacture can use the name of the original proprietor without at the same time giving notice on the label, or circular, or trade-mark, that he is a successor of the originator whose name constitutes part, and the essential part, of the trade-mark. Leather Cloth Co. v. American Leather Cloth Co., 11 Jur. (N. S.) 513, Cox, Trade Mark Cas. 699. The right obtained by Carter & Dodge was a limited territorial one, and did not include the state of Maine, or New Hampshire. The first requisite of an exclusive property in a trade-mark is the exclusive right to manufacture or sell the specific article to which it applies. Upton, Trade-Marks, 23; Canham v. Jones, 2 Ves. & B. 218. It is plain that no such right ex-

ists in this case, for the grantor, Moses Atwood, reserved certain territory to himself, and excepted Maine (where the respondents do business) and New Hampshire. Now, under these circumstances, it is plain that no exclusive right to the use of the words "Atwood's Bitters" could be claimed by Carter & Dodge, and consequently none could be assigned to the complainants. Not having the exclusive right to the medicine, neither the complainants nor their assignors can have an exclusive right to the name of the same. There is no such thing as the sale of a trade-mark, or indeed the existence of one in the abstract, unconnected with a specific property or article of merchandise to which it is affixed. Upton, Trade-Marks, 22; Leather Cloth Co. v. American Leather Cloth Co., Cox, Trade Mark Cas. 698. Thus the right to the trade-mark of an article is dependent upon and follows the nature and extent of the ownership of such article.

The allegation of the bill, of the exclusive ownership of the alleged trade-mark, is, therefore, not sustained. But the rights of the assignors of the complainants, if any, were forfeited long before the attempted transfer: 1. By the use of the alleged trade-mark as a means of misrepresentation and deception upon the public, in the sale of a spurious article under the same. 2. By laches, and long acquiescence in the use of the alleged trade-mark by the respondents and by others. 3. By a disregard, among themselves, of their several allotted rights under the said trade-mark, and of the limitations put upon the same, and the grant of the same by Moses Atwood. 4. By the voluntary relinquishment of the bottle, label, &c., as used by Moses Atwood, and conveyed to Carter & Dodge, in 1852, and the adoption of new trade-marks of their own invention.

Under the original label a deceit was practised upon the public. While Carter's agents were only sent out with his new label and genuine manufacture, great quantities were secretly by him put upon the market, of an article which would not keep, which fermented and soured, and which could not stand exposure to the sun. These were often returned to dealers on account of their imperfection. The question upon this point is, could Carter himself have maintained his right to the exclusive use of a trade-mark which he had prostituted to such uses? Had he not forfeited any right of property in it by these practices?

A trade-mark, as has been shown, is only recognized by a court of equity when connected with some article of merchandise to which the skill and enterprise of the manufacturer or seller has given a reputation. It is then, and then only, property. It is a source of profit to the proprietor, and a guaranty to the public of the good quality of the article to which it is affixed. But if used as a means of misrepresentation or deceit, it is property no longer, and he who uses it for such purpose can claim no property rights under it. Upon this point the authorities are numerous and clear. Hobbs v. Francais, 19 How. Prac. 567; Phalon v. Wright, Cox, Trade Mark Cas. 311; Pidding v. How, Id. 640; Perry v. Truefitt, 6 Beav. 66; Upton, Trade-Marks, 30, 31. "When a person seeks, by representations which are untrue, to mislead the public into the belief that his commodities . . . are compounded or produced in a manner not in accordance with the truth, . . . he places himself beyond the pale of the protection of the law, and, acquiring no exclusive right in the trade-mark he uses, is entitled to no relief against any one who may see fit to appropriate it." Carter & Dodge both say they never acknowledged Bateman's claim of right. From this we can only conclude that Bateman disputed their right to the bottle and label, and maintained his position in the courts. From 1861 to 1875, after this, Bateman continued to use the bottle and label, his right to which the assignors of the complainants never conceded, but simply acquiesced in. In 1875, the complainants step in and buy up both these opposing rights, Bateman's and the Carters'. This might do if it were to quiet title to a piece of real estate. But with respect to this class of property,—trade-marks,—the law is different. A man can buy up all the conflicting titles to real estate, and so obtain a valid ownership. But in the case of property in trade-marks, the adverse claim of any one, if successfully maintained, as Bateman's was, destroys that exclusiveness which is the essential quality to the preventing of others from using the same mark on the same goods.

Where long acquiescence in the usurpation of another party is proved, still an injunction will be granted when the party resumes his original right. Here no resumption was pretended, but continued acquiescence is shown from the fact that Bateman's right was bought by the complainants, thereby acknowledging it. McLean v. Fleming, 96 U. S. 245; Amoskeag Manuf'g Co. v. Garner, 55 Barb. 151; Beard v. Turner, 13 Law T. [N. S.] 747. This case was different from those of acquiescence usually found in the reports. Simple acquiescence may affect the question of costs or damages, but will not, on a resumption by the person originally entitled to the trade-mark, work any forfeiture. Here, however, was an ineffectual attempt to enforce the rights of the assignors of the complainants and a judgment of a court of equity adverse to them, and a dismissal of an action at law, and then an acquiescence of nearly fifteen years, and no attempt, either by the complainants or their assignors, to resume the right.

The right to the exclusive use of the bottle and label was also forfeited by the assignors of the complainants, before the assignment, by a division of the right among themselves, by a disregard by all of them of the terri-

torial limits assigned to each in the division, and of the limits set to all of their united territorial rights, by Moses Atwood, the original grantor. This presents a question of a peculiar character. Here were three or four persons or firms who at some time had had territorial grants of rights under a supposed trade-mark on a certain manufacture. After a time they divide up that territory among themselves. Then shortly they each and all deliberately go to work to trample down and violate each other's rights under their division, and wholly disregard the trade-mark privileges of each other. Not only this, but they all also transgress the territorial limits fixed upon all their rights put together, and wholly disregard the original grant from the first grantor, and all trespass on territory which he had reserved to others. This state of things continued for fourteen or fifteen years. They were separate, distinct, and competing firms. They had no common business interests, and they were all concerned in disregarding each other's rights, if any, under this trade-mark, set up by these complainants, and in violating the rights of other assignees. The firms thus continued down to the very moment of the assignments to the complainants, and were the sole assignors (including Bateman, who was also selling anywhere he pleased all the time) of the complainants. Previous to the assignment to the complainants, could these parties, Dodge, Carter, Noyes & Manning, and Bateman, have successfully set up any right in a court of equity, founded upon an alleged trade-mark in the disregard and violation of which they had been engaged for years; not only as against each other, but also as against all persons; could they say that that was valid which they, the owners, had been proving was worthless and invalid; could they thus disregard and violate a right inter sese, and as to others, and then claim relief under it at the same time? If the assignors could not, how could their assignees, who take the alleged right in the midst of these violations of it at the hands of its owners? The trade-mark right, if any, was given up and others substituted for it by its owners, and so, never having been resumed, was forfeited and lost. Each manufacturer designated his goods by his own name. The words Atwood's Bitters was thereafter simply and only a genuine term denoting simply a class of goods, not an especial manufacture by any one person or firm. Browne, Trade-Mark, §§ 131–137, 180, 181; Singleton v. Bolton, 3 Doug. 293. Precisely the same result was produced with Carter.

Mr. Webb argued orally, but filed no brief.

CLIFFORD, Circuit Justice. Equity gives relief for the infringement of a trade-mark, upon the ground that one man is not allowed to offer his goods for sale, representing the goods to be the manufacture of another in the same commodity. Seixo v. Provezende,

1 Ch. App. 195. What degree of resemblance is necessary to constitute an infringement is incapable of exact definition; but the rule is, that no trader can adopt a trade-mark so resembling that of another as that ordinary purchasers, buying with ordinary caution, are likely to be misled. McLean v. Fleming, 96 U. S. 245. Two trade-marks are substantially the same in legal contemplation if the resemblance is such as to deceive ordinary purchasers, giving such attention to the same as such purchasers usually give, and to cause them to purchase the one manufacture, supposing it to be the other. Gorham Co. v. White, 14 Wall. [81 U. S.] 528.

Relief is claimed in this case upon the special grounds set forth in the bill of complaint. They are, in substance and effect, as follows:

1. That the corporation complainants for a long time have been and now are the manufacturers and vendors of an article of medicine called and known as "Atwood's Vegetable Physical Jaundice Bitters," taken internally, for the cure of jaundice and other diseases; that during all the time they have been engaged in making and selling the article, it has been put up and sold in the same manner, and with the same trade-marks, labels, and wrappers affixed thereto, in glass bottles, with twelve panel-shaped sides, having on five of the sides the raised words and letters, "Atwood's Genuine Physical Jaundice Bitters, Georgetown, Mass.," blown in the glass on each bottle, each bottle containing about a pint of the medicine in liquid form, labelled with a light-yellow printed label, pasted on the outside, as fully set forth in the bill of complaint.

2. That the said medicine was first invented and put up for sale about twenty-five years ago by one Dr. Moses Atwood, formerly of Georgetown, Mass., by whom, his assigns and successors, the same has been ever since made and sold by the same name, in the same manner, and with the same trade-marks and description.

3. That the complainants, long prior to the alleged infringement, became the lawful, sole, and exclusive owners of the formula or recipe for making said medicine, and of the sole and exclusive right to use said name or designation therefor, together with all said trade-marks, labels, and goodwill of the business of making and selling said medicine.

4. That the respondents, prior to the filing of the bill of complaint, at Portland, and at divers other places unknown to the complainants, have manufactured and sold, and are still manufacturing and selling, large quantities of medicine, of an inferior quality, in imitation of the article manufactured and sold by the complainants, and without their consent.

5. That during all that time the respondents have made, put up, and sold, and still make, put up, and sell their said imitation and counterfeit article as and for the genu-

ine article of the complainants, so put up, marked, and labelled, that it is very difficult to be distinguished from the complainants' genuine article.

6. Based on these allegations, the complainants pray for an account and for an injunction, restraining the respondents from affixing or applying to any article of medicine manufactured, sold, shipped or supplied by them, or to the bottles or packages in which the same is put up, the complainants' trademark words, to wit, "Atwood's Vegetable Physical Jaundice Bitters," or either of said words, or any imitation thereof.

Service was made, and the respondents appeared and filed an answer, setting up several defences to the following effect:

1. They admit that complainants purchased all the right, which the parties named in the answer owned, to prepare the Atwood Bitters, but they deny that those parties held or possessed the exclusive right to manufacture the same, or any exclusive right whatever to the same, or any exclusive right to any trade-mark, label, or wrapper, consisting of a glass bottle with panel-shaped sides, and with the raised words and letters, "Atwoods's Genuine Physical Jaundice Bitters, Georgetown, Mass.," blown in the glass; nor did they possess any exclusive right to the preparation of the medicine in a liquid form, or to the light-yellow printed label pasted to said bottle, upon which were the words, "Atwood's Vegetable Physical Jaundice Bitters." Nor did they possess any exclusive right to the residue of what is printed upon the label, and set forth in the bill of complaint.

2. That the twelve-panel bottle, the yellow label, the words "Atwood's Bitters," together with the other words alleged to be printed on said label, were in public and common use by a large number of manufacturers.

3. That the complainants did not purchase and do not now own the exclusive right, nor the entire right, to said bottle, label, and words, or either of them, as alleged, because their said assignors were not the exclusive proprietors of the same, and therefore could not sell and dispose of what they did not own.

4. They deny that Moses Atwood first invented and put up the said medicine for sale, and allege that it was first put up by Moses F. Atwood, of Georgetown, Mass., in connection with L. H. Bateman, not in a panelled bottle, but in a smooth, round bottle, without panels; that the round bottle used by Bateman had no words blown in the glass, and that the bottles which contained words blown in the glass were rectangular in form and without panels, and that Moses Atwood first used a white label and a round bottle having no panels or blown letters.

5. That Moses F. Atwood, and not Moses Atwood, first obtained the formula for the medicine from some physician to these respondents unknown, and prepared the same according to the formula, and not according to any invention of himself or of said Moses Atwood; and that, subsequently thereto, the medicine put up by him and Bateman began to be called "Atwood's Bitters."

6. That the respondent first named, in May, 1861, purchased the recipe for the medicine, and the right of using the bottle and label, that he has a right to use the same, and that no person has ever pretended to interrupt him in such use prior to the present suit.

7. That L. F. Atwood, the brother of Moses Atwood, also had a right to use the said label and bottle, and that he sold such a right to H. H. Hay, of Portland, who uses the same on the bottles containing the medicine.

8. That they have been in the practice of preparing the medicine, under the recipe bought of Moses F. Atwood, for the period of fourteen years, and that they have spent large sums of money in advertising the medicine, and in creating a market for the same.

Proofs were taken on both sides, and the evidence is voluminous and somewhat conflicting. Any discussion of the legal questions arising in the case would not be of much advantage until the facts are ascertained, which will be best accomplished by distinct findings.

Pursuant to that view, the court finds as follows:

1. That Moses Atwood, Georgetown, Mass., commenced preparing the medicine in question nearly forty years ago; that for a time the formula of the ingredients was a secret, and that he soon began to designate the preparation as his medicine more frequently than otherwise, designating it as Moses Atwood's Bitters or as Moses Atwood's Jaundice Bitters, and sometimes as Atwood's Vegetable Jaundice Bitters. There is no direct proof that he ever adopted any distinct trade-mark, but the evidence of use is such as to warrant the conclusion that he considered the latter designation as representing the article which he manufactured and put up for sale. For a time no other person had any interest in the business, and throughout all that period he put the article up in round, smooth bottles without panels or raised words or letters of any kind. Others subsequently acquired an interest in the business with him, among whom were his brother and L. H. Bateman, and the person who subsequently joined with him in the conveyance to Carter and Dodge. His son, Moses F. Atwood, had worked with him and Bateman at Georgetown in preparing the medicine under the recipe, and knew the ingredients of which it was compounded. He, the son, went to work with Bateman in 1860, and he states that they used a fluted bottle containing the name of the medicine and that of his father, and his place of residence blown into it.

2. That large rights in respect to the business remained in Moses Atwood, notwithstanding the interest in the same acquired by others; that Jan. 1, 1848, he entered into a

written contract with Moses Carter, by which he sold to the latter bills against local agents in many places in Massachusetts, Rhode Island, Connecticut and New York, and the right to sell the medicine in those places, under the terms and conditions following: that he, the manufacturer, should not sell the medicine in those places so long as the other party supplied customers there; that he, the proprietor, agreed to make the bitters during ten years for seventeen dollars per barrel, to be delivered in the state where the same were made, three-quarters of the money to be advanced by the other contracting party.

3. Carter and Benjamin S. Dodge, Feb. 2, 1852, formed a copartnership, which, of course, consisted of two parts; but they subsequently took into the firm C. L. Carter, and by interlineations made the articles consist of three parts. They formed the copartnership for making and vending Atwood's vegetable medicines and essences. Enough appears to afford an inference that a prior agreement between Moses Carter and Dodge of the one part, and Moses Atwood of the other, had been made, as the record shows that Atwood and Bingham and Carter and Dodge, Sept. 29, 1852, entered into a contract to settle doubts and supply omissions in the supposed antecedent agreement, which was not introduced in evidence.

4. By the contract introduced, Moses Atwood and his partner conveyed to Carter & Dodge the right to use said Atwood's name on the labels and circulars, and to manufacture and sell "Atwood's Vegetable Jaundice Bitters," and certain other articles, on the ground hereinafter described, and not to sell by themselves or their agents in any other portion of the world, or sell to others to sell, except on the ground hereinafter described. Massachusetts is named, with numerous excepted towns and parts of towns. Towns and places are also excepted from New York. Seven towns are also excepted from New Hampshire; and all of the state of Maine, except the towns of Kittery, South Berwick and Lebanon. Other exceptions are made in the same instrument, not necessary to be noticed in this investigation. Attempt was made to prove by parol the prior agreement referred to in the contract, and with that view reference was made in argument to the cross-examination of Luther F. Carter, who states that there were papers executed to Carter & Dodge, giving them the right to manufacture the bitters, using Moses Atwood's name, but that he knew nothing about the bottle. When asked if those papers came into his possession he answered that he didn't know that they ever did. He was then asked, "If they were ever in your hands, to whom did you deliver them?" and his answer was, "If they were ever in my hands I delivered them to Eli B. Johnson," the record showing that the person named was the agent of the complainants. Taken as a whole, the court is of the opinion that the evidence was not sufficient to admit parol testimony of the contents of the instrument, nor would it benefit the complainants if the rule was otherwise, as the witness states that he does not know that the paper or papers conveyed any thing more to Carter & Dodge than the right to put up the medicine and use Atwood's name; nor does the record contain any evidence tending to show that the original proprietor ever gave them the right to sell the medicines in any of the places excepted out of the contract introduced in evidence.

5. That parol evidence was introduced, tending to show that Carter & Dodge owned, at the time of their dissolution of copartnership, all the right in Atwood's Bitters to manufacture and sell the same, except what Atwood had reserved; but there is no evidence that he ever conveyed to them any right to put up or sell the same in the places reserved, nor is there any evidence tending to show how, if ever, he acquired the interest in the same at one time held by his brother and Bateman.

6. Suggestions were made in argument that Moses Atwood, in the year 1855, conveyed to Carter & Dodge, or Carter, Dodge & Co., his entire interest in the business, except his right to sell the medicine beyond Illinois. What a party does not own of course he cannot sell and that is a sufficient answer to the proposition, so far as respects the interests which had become vested in others; but the supposed sale might apply to some of the excepted places, not to all, as the same witness admits that Carter & Dodge did not own what Mr. Atwood had reserved, but he says that he once saw the agreement last referred to, and, when asked if he had made search for it, stated that he had made diligent search for it among his father's old papers. It was about the time that Carter, Dodge, & Co. brought the suit against Bateman that he saw the paper, and he says he has not seen it since that time. According to his statement the paper was from Moses Atwood to Carter, Dodge, & Co. Carter & Dodge sued Bateman for putting up and selling the medicine and using the trade-mark, and he prevailed in the suit; and yet no search was made among the papers of Mr. Dodge. For aught that appears to the contrary, it may be among his papers, or in the hands of the attorneys in that suit, or in the files of the clerk's office.

Two objections are taken to the evidence, both of which may be sustained: First. That sufficient search is not shown to admit it. Second. That, if it is admitted, it has no tendency to show that the conveyance included Maine, or any other of the excepted places; nor does it appear that the grantor reacquired the interests previously vested in other persons. Localities almost without number were excepted out of the general grant, and the uncontradicted proof is that the original proprietor made reservations in favor of his father, Levi Atwood, and his brother, Levi

F. Atwood, of Maine and part of New Hampshire.

7. Viewed in the light of these suggestions, the court finds that Carter & Dodge never acquired the right to put up and sell the medicine in Maine, or in any of the places excepted out of the grant from the original proprietor, nor did they ever acquire the right or title to any of the same reservations in favor of other parties. Trade-marks are an entirety, and are incapable of exclusive use at different places by more than one independent proprietor, for the reason that the party seeking redress, in order to establish an exclusive right to the trade-mark, must show that he had an exclusive right in the commodity to which it is attached. Upton, Trade-Marks, 24; Canham v. Jones, 2 Ves. & B. 218. Throughout the largest portion of the period since 1842, Bateman, or his son, who succeeded him, put up and sold Atwood's Bitters in the same town with the original proprietor, and the proofs show that he put the medicine up in half pint glass bottles, with the words, "Atwood's Jaundice Bitters, Moses Atwood, Georgetown, Mass.," blown upon the bottles; that when the proprietor removed, in 1855, he left with Bateman his original recipe for the manufacture of Atwood's Bitters, with all the medicines which he manufactured and sold. Little or nothing was made in the business during the lifetime of Bateman; and when he died, his son succeeded to and continued in the business until the heirs transferred the same to the complainants. For a few years, Carter & Dodge put up and sold the medicine, in accordance with the course pursued by the original proprietor, when they took into the firm the son of the senior partner, C. L. Carter, and continued to transact the business under the name of Carter. Dodge & Co, two or three years longer. When they dissolved and Dodge went out, the new firm, called Carter & Son, consisting of Moses Carter and C. L. Carter, took control of the business, and they continued the same for about five years. Subsequently, another son of the senior partner joined the firm, and they continued the business for two or three years under the firm name of Carter & Sons. Lastly, the father and the elder son went out, and Luther F. Carter took the firm name of Carter & Son, and continued the business until he sold to the complainants. After Carter & Dodge dissolved in 1855, Dodge went to Rowley, and put up and sold the medicine there for five years, using the Atwood labels. On the 4th of September, 1867, he sold and conveyed the right to manufacture and sell Atwood's Bitters to William B. Dorman for the term of five years from the date of the agreement, with the right to use the trade-marks he had previously used in the sale of the same. Before that period expired, the same party sold the same right to Noyes & Manning, now of Mystic, Conn., with authority to use the same labels.

8. That Carter & Son had two kinds of labels used on the bottles which they put up for sale. On the top of one of the labels the words "Carter's are the only genuine" were printed, and below the directions, the words "Manufactured by M. Carter & Son, successors to Moses Atwood, Georgetown, Mass.," were also printed. At the bottom of the label were also printed the words "Caution.—Observe that our name is blown in the bottle and on the revenue stamp. None others are genuine." The label also bore the words "Atwood's Vegetable Physical Jaundice Bitters." Two kinds of bitters were put up at their place. One kind, under the label described, which was the genuine "Atwood's Vegetable Physical Jaundice Bitters," sold in the market, at wholesale, for twenty-seven dollars per gross; the other kind was an inferior article, an imitation of the genuine, sold in the market at fifteen dollars per gross, bearing the genuine original label of Atwood's Bitters, with the "e" left out in the word "the" preceding the words United States. Carter's traveling agents never sold any but the genuine article, the imitation being disposed of by Carter alone. In most instances the two kinds were retailed at the same price; but when both kinds were known, the genuine brought a higher price.

9. That Bateman had the original recipe, and that Moses F. Atwood, the son of the original proprietor, when in the employment of Bateman as a selling agent, sold the recipe for compounding and preparing the Atwood Bitters in the state of Maine to Nathan Wood, in 1861. When asked whether the conveyance was in writing, he said it was, and that each party had a copy, and that he sold to the respondent the right to manufacture the bitters and sell the same in the state of Maine and elsewhere. Proof that the grantor had authority from the actual proprietor to execute the conveyance is not shown in the record; but it is shown that the purchaser, with his partner, has continued to prepare, put up, and sell the medicine, from the date of the purchase of the recipe to the date of the bill of complaint, without hindrance or interruption, with the exception of the two instances mentioned in the second answer, since the organization of the complainant corporation. None of the grantors of the complainants ever disputed their right to compound, put up, and sell the bitters in question, nor is there any evidence tending to show that the bitters which they sold were not the genuine Atwood Bitters. Their grantor possessed the genuine recipe, and the proofs are full to the point that it was the genuine recipe which he sold to the respondent, Nathan Wood. Beyond all doubt the respondent, Nathan Wood, acquired the recipe, which, not being the subject of a patent, might lawfully be used by any one who possessed the secret; and it is equally certain that he supposed that he had acquired the right to use the labels, as he pur-

chased the right to use the same of the son of the original proprietor, and of the selling agent of Bateman, whose title to put up the medicine and use the labels was subsequently established by judicial determination.

10. Unlike what is usual in controversies respecting trade-marks the complainants in this case, instead of using a trade-mark of their own adoption, allege and attempt to prove that the trade-mark in question was adopted by the original proprietor of the medicine, and that they have acquired the title to the same by certain mesne conveyances set forth in the record, and the court finds upon that subject as follows: 1. That they, or their predecessors, Jan. 1, 1875, acquired, by assignment, whatever right in the same belonged to the heirs and representatives of L. H. Bateman. 2. Also, March 18, in the same year, whatever right belonged to the firm of Noyes & Manning. 3. Also, March 30, in the same year, whatever right belonged to Benjamin C. Dodge. 4. Also, March 30, in the same year, whatever right belonged to William B. Dorman. 5. Also, April 12 and 19, in the same year, whatever right belonged to the Carters in the said trade-mark.

None of these instruments of conveyance, however, convey, or profess to convey, any greater rights to the complainants than those which were previously held by Carter & Dodge; and it is clear that Carter & Dodge never acquired from the original proprietor any right to put up or sell the medicine in Maine, or to use the labels of the original proprietor in that state, out of the three towns specified in the written agreement, which constitutes the evidence of their title.

Nothing remains to be done in the case of much importance, except to state the conclusions of law and fact resulting from the findings of the court:

1. Examined in the light of the findings, as the case must be, it is clear to a demonstration that the complainants have no exclusive right to put up and sell the medicine, nor any exclusive right or title to the labels, which belonged to the original proprietor.

2. That all they claim in respect either to the medicine or the labels is the right to the same which was held by Carter & Dodge, who never possessed the right to put up the medicine or to use the labels in any part of Maine, except the three towns named in the said written agreement.

3. That the rights of certain of the assignors of the complainants, if any they ever had, were forfeited long before the supposed transfer under which the complainants claim, by the use of the trade-mark as a means of misrepresentation and deception to the public, by putting up a spurious article, and using the genuine trade-mark to promote the sale of the spurious article. Misrepresentation and deceit of the kind divest the guilty party of all title to the same, and it follows that a party who has forfeited his property in the same cannot convey any title to another. Phalon v. Wright, Cox, Trade Mark Cas. 311, 5 Phila. 464; Perry v. Truefitt, 6 Beav. 66; Pidding v. How, 8 Sim. 477; Hobbs v. Francais, 19 How. Prac. 567; Partridge v. Menck, 1 How. Cas. 547; Fetridge v. Wells, 4 Abb. Prac. 144; Flavell v. Harrison, 19 Eng. Law & Eq. 15. Equity will not decree for an account of past gains and profits where there has been laches in bringing the suit and long acquiescence in the use of the trade-mark by others, and especially not where the acquiescence covers a period of fourteen years. McLean v. Fleming, 96 U. S. 245; Harrison v. Taylor, 11 Jur. (N. S.) 408; Moet v. Couston, 10 Law T. (N. S.) 395; Edelsten v. Edelsten, 1 De Gex. J. & S. 185; Estcourt v. Estcourt Hop Essence Co., 10 Ch. App. 276; [Molt v. Couston, 33 Beav. 580.] [3]

4. That the assignors of the complainants forfeited all their property, if any, in the trade-mark belonging to the original proprietor, by a disregard, among themselves, of their several allotted districts, after the grant or license from the original proprietor, by trespassing upon each other, and misuse of the trade-mark.

5. That the grantees or licensees of the original proprietor, and their successors, forfeited the right to the original trade-mark of their grantor or licensor by the voluntary relinquishment of the bottle, label, and directions, which he used before the transfer, and by the adoption of new and different labels, &c., of their own substitution, one or more of whom put up and sold a spurious article of medicine under the genuine label, and used a different label of his own invention on bottles containing the genuine medicine. Cases arise where the title is complete, when a party, though not entitled to a decree for an account, may still be entitled to a decree to prevent future infringements; but the difficulty in the way of the complainants in this case is incurable, as the evidence shows that the respondents have the genuine recipe, which is not protected by any patent, and the complainants have not any exclusive right to the use of the label, and no right at all to the use of it in the state of Maine.

Bill of complaint dismissed, with costs.

[The case was taken by the complainants, on appeal, to the supreme court, where, Justice Field delivering the opinion, the decree of the circuit court dismissing the bill was affirmed. 108 U. S. 213, 2 Sup. Ct. 436.]

MANHEIM, In re.   See Case No. 9,038.

MANIERRE (MOHR v.).   See Case No. 9,-695.

MANIN (POMEROY v.).   See Case No. 11,-260.

[3] [From 14 O. G. 519.]